LANGKAWEL *v.* STATE LAND OFFICE BOARD.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—JURISDICTION.
   Question of lack of jurisdiction of chancery court is not passed upon where decision is based upon a review and determination of controverted factual issues.

2. BILLS AND NOTES—MORTGAGES—REFERENCE TO OTHER INSTRUMENT.
   Notes totaling sum for which mortgage, dated the day previous, was given *held,* to have been given incident to such mortgage although notes bore no reference to mortgage which inaccurately referred to notes as "bearing even date herewith" in printed form.

3. APPEAL AND ERROR—FINDING OF COURT—EVIDENCE.

Amount which trial judge found debtor admitted he owed estate of his mortgagee *held*, sustained by record.

4. MORTGAGES—STATUTE OF LIMITATIONS—INTEREST—INDORSEMENT OF PAYMENT—SCAVENGER SALE—RIGHT TO MATCH BID.

Mortgage obligation was not barred by statute of limitations so as to prevent holder of mortgagee interest from priority of right to match bid accepted at scavenger sale where mortgagor admitted owing a certain amount substantially less than total face value of mortgage- and chattel-mortgage-secured notes held by mortgagee's administrator and mortgagor made payments of interest on such admittedly owing sum as late as 9 years previous to scavenger sale although actual indorsement was not made on any particular note (3 Comp. Laws 1929, § 13976, as amended by Act No. 193, Pub. Acts 1937; Act No. 155, § 5, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

5. SAME—STATUTE OF LIMITATIONS—PAYMENT—INDORSEMENT OF PAYMENT—SCAVENGER SALE.

Transaction evidenced by receipt bearing notation "interest on notes to" mortgagee of coal dealer which was given dealer by trustee of holders of mortgagee interest less than three years previous to scavenger sale of mortgaged property which receipt was given for value of fuel furnished rather than money paid was sufficient to save mortgage from becoming outlawed where it clearly appears to have been considered by all parties concerned to have been a payment on the mortgage indebtedness although not actually indorsed either on the mortgage notes or the mortgage (3 Comp. Laws 1929, § 13976, as amended by Act No. 193, Pub. Acts 1937; Act No. 155, § 5, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

6. BILLS AND NOTES—CONSIDERATION—EVIDENCE.

Claim of lack of consideration for so-called "good will" note, given by coal dealer to chattel mortgagee who had previously also indorsed mortgagor's obligation to a bank, which note was valid on its face and upon which coal dealer had made payment by delivery of coal and checks before and after death of mortgagee *held*, belated and without support in chancery suit wherein validity of note was challenged.

7. TAXATION—SCAVENGER SALE—RIGHT TO MATCH HIGH BID.

In mortgagor's suit to enjoin ejectment action by purchasers from holders of mortgagee interest who had been permitted to match high bid at scavenger sale by State land office board,

its determination that they had the superior right to match such bid was correct where property had been assessed at $10,000, plaintiff's expert witnesses had valued it at $14,000, and at least something over $15,000 of mortgage-secured debts not barred by the statute of limitations were due mortgagee (3 Comp. Laws 1929, § 13976, as amended by Act No. 193, Pub. Acts 1937; Act No. 155, § 5, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

8. Appeal and Error—Findings by Trial Court—De Novo Review.
   Claim that the trial judge's findings of fact are *res judicata* on a plaintiff's appeal where defendants do not cross-appeal in suit to enjoin an action of ejectment is not sound as the Supreme Court hears a chancery case *de novo.*

9. Same—Right to Match High Bid at Scavenger Sale—Mortgages—Heirs.
   Claim that interest of only one of two heirs of deceased mortgagee should be basis of fixing his financial interest in determining his right to match the high bid at a scavenger sale is untenable where such claim was first made on recent reply brief on appeal and record conclusively shows that right to meet such bid was made by such heir on behalf of himself and sister who together held the entire mortgagee interest that was a decidedly larger financial interest than plaintiff mortgagor had in the property (Act No. 155, § 5, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939).

Appeal from Muskegon; Miles (Fred T.), J., presiding. Submitted April 8, 1943. (Docket No. 21, Calendar No. 42,278.) Decided June 7, 1943. Rehearing denied September 7, 1943.

Bill by Otto L. Langkawel against State Land Office Board and others to set aside the board's determination of ownership and for an accounting and an injunction restraining an action at law. Bill dismissed. Plaintiff appeals. Affirmed.

*Fred P. Geib* (*Clem H. Block,* of counsel), for plaintiff.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Peter E.*

*Bradt,* Assistant Attorney General, for defendant State Land Office Board.

*Cyrus M. Poppen,* for defendants Clink and Lawrence.

*William J. Balgooyen,* for defendant Rooks Transfer Lines.

*Edward C. Farmer,* for defendant Anaconda Wire & Cable Company.

North, J. Among other phases of relief sought by plaintiff in his bill of complaint, he prayed for injunctive relief against prosecution of an ejectment suit brought against him by defendant Rooks Transfer Lines, Inc., which asserted title through defendants Clink (Stephen H. Clink and Janet Clink Lawrence); and also a review of the decision of the State land office board which followed the sale of plaintiff's property at a so-called scavenger sale that the defendants Clink, as so-called owners (mortgagees), had the preference in right to match the amount bid at the sale rather than plaintiff, the fee owner. After hearing, the trial court sustained defendants' contention that the equity court was without jurisdiction and entered a decree dismissing plaintiff's bill of complaint. Plaintiff has appealed.

Notwithstanding the case was disposed of on the ground and in the manner just above noted, the trial court reviewed the factual aspect of the case and reached the conclusion that the State land office board erred in determining that the mortgagees had the greater financial interest in the property and the preference in right to match the bid made at the scavenger sale rather than plaintiff. On this appeal the case is before this court for hearing *de novo;*

and our consideration of the record leads to the conclusion that since decision can be based upon a review and determination of the controverted factual issues, it is not necessary to pass upon the question of jurisdiction of the chancery court.

The record of more than 300 pages is devoted to the details of transactions between plaintiff and Stephen H. Clink, Sr., father of defendants Clink herein, and the Clink estate. These transactions extended over a period of nearly 20 years and as to many of them the record is indefinite and unsatisfactory. This condition has arisen from the fact, as fairly appears from the record, that the earlier of these transactions were between parties who sustained intimate friendly relations and who had mutual confidence in each other. The difficulties are enhanced by reason of the death of Stephen H. Clink, Sr., in 1925, and the resulting bar against testimony of adverse parties as to matters equally within the knowledge of deceased.* Except to the extent hereinafter set forth, we deem it unnecessary to decision to attempt to review in all its aspects the factual background.

For many years prior to the date of the scavenger sale of 1941, plaintiff herein, either in his own right or together with a business associate whose interest he later acquired, had been the owner in fee of property described as lots number 1, 11, 12, 13, 14, and 15, of block 469 of the revised plat of the city of Muskegon. This property was primarily used by plaintiff, and for a time by him and his business associate, in connection with a coal business. Stephen H. Clink, Sr., was not only an intimate friend of plaintiff but also his legal adviser prior to 1925, the date of Mr. Clink's death. Incident to the con-

---

* See 3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914).—RE-PORTER.

duct of his business, and also at the time he purchased the interest of his former business associate for $14,790 in 1923, plaintiff had occasion to borrow extensively from the National Lumberman's Bank of Muskegon; and plaintiff's obligations to the bank were indorsed in large amounts by Stephen H. Clink, Sr. Mr. Clink, Sr., from time to time took plaintiff's notes and also real estate and chattel mortgages to indemnify himself against contingent liabilities he thus assumed or to secure payment of plaintiff's indebtedness to Mr. Clink. The various transactions of this character have produced a rather indefinite and uncertain background to the later transactions between plaintiff and Stephen H. Clink, Sr.

Mr. Clink, Sr., was general counsel for the Grange Life Insurance Company and negotiated a $10,000 mortgage loan by it to plaintiff on property hereinbefore described. This was accomplished August 6, 1924. The money thus obtained was used as part payment to the National Lumberman's Bank of plaintiff's $14,000 note dated November 12, 1923, indorsed by Stephen H. Clink, Sr. For the obvious purpose of making the Grange Life Insurance Company mortgage a first lien on plaintiff's property, Stephen H. Clink, Sr., discharged of record two mortgages, one for $20,000 and the other for $5,000, which he held on plaintiff's property at that time. However, the record discloses that Mr. Clink, Sr., then took another mortgage covering the property in suit (except lot 15) in the sum of $12,000, dated August 5, 1924, which has never been discharged of record. This mortgage was obviously taken in contemplation of completing the loan from the Grange Life Insurance Company because in the Clink mortgage it is stated: "This mortgage is second to a mortgage made by the same parties (plaintiff and

wife) to the GRANGE LIFE INSURANCE COMPANY in the sum of $10,000 bearing even date herewith.'' The record also discloses that on August 6, 1924, plaintiff gave two notes, payable to Stephen H. Clink, Sr., one in the sum of $3,000, and the other for $9,000. While the notes do not refer to the mortgage, nonetheless we are satisfied that they were the notes given incident to the mortgage dated August 5th, but the transaction evidently was closed on August 6th, when the mortgage to the Grange Life Insurance Company was executed. This we conclude was so notwithstanding plaintiff's mortgage to Stephen H. Clink, Sr., does not make specific reference to the two notes aggregating $12,000, but instead recites that the mortgage was given to secure payment of $12,000: ''According to a certain promissory note, bearing even date herewith.'' In this connection it may be noted reference to the original mortgage discloses that the quoted words ''bearing even date herewith'' are a part of the printed form of mortgage used, and the inaccurate reference must be considered in the light of that circumstance; which together with other features of this conveyance plainly indicate that it was not carefully prepared.

In 1934 the Grange Life Insurance Company mortgage was satisfied and discharged of record. Thereupon the $12,000 Clink mortgage became a first mortgage lien. So far as the record discloses this $12,000 mortgage has never been paid, and it appeared of record at the time of the scavenger sale.

Following the giving of the $12,000 mortgage in August, 1924, Stephen H. Clink, Sr., died in April, 1925; and in 1926 the Hackley Union National Bank of Muskegon was appointed administrator with the will annexed of the estate of Stephen H. Clink, Sr., deceased. At that time the widow of Stephen had a

beneficial interest in his estate, but from and after her death in 1938 all of the rights to and interests in both his estate and in her estate passed to their son and daughter, Stephen H. Clink and Janet Clink Lawrence, two of the defendants herein. After the Hackley Union National Bank became administrator it paid to the National Lumberman's Bank $7,543.84, together with some accrued interest, in satisfaction of plaintiff's obligations to the Lumberman's bank on which Stephen H. Clink, Sr., was liable; and there came into possession of the Hackley Union National Bank as administrator the following notes evidencing indebtedness of plaintiff:

1.   Plaintiff's note dated November 12, 1923, for $14,000, reduced by payments to $3,009.91; payable to the National Lumberman's Bank and indorsed by Stephen H. Clink, Sr.

2.   Plaintiff's note dated November 20, 1923, payable to Stephen H. Clink, Sr., for $5,000;

3.   Plaintiff's note dated August 6, 1924, in the sum of $3,000 payable to Stephen H. Clink, Sr.

4.   Plaintiff's note dated August 6, 1924, for $9,000, payable to Stephen H. Clink, Sr.

5.   Plaintiff's note dated January 12, 1925, for $3,000, with unpaid balance of principal $1,500, payable to the National Lumberman's Bank and indorsed by Stephen H. Clink, Sr.

6.   Plaintiff's note dated January 26, 1925, for $2,500, with balance of principal unpaid, $2,000, payable to the National Lumberman's Bank and indorsed by Stephen H. Clink, Sr.

In addition to the above the administrator also became possessed of two chattel mortgages, dated November 20, 1923, one for $5,000, and the other for $20,000; and a real estate mortgage dated August 5, 1924, hereinbefore mentioned, in the sum of $12,000.

In each of these mortgages plaintiff was a mortgagor and Stephen H. Clink, Sr., the mortgagee.

The record fails to show with satisfactory clearness to what extent each of the above instruments evidence actual indebtedness from plaintiff to Stephen H. Clink, Sr., or what portion of them may have been given to secure him against loss incident to his having indorsed plaintiff's obligations to the National Lumberman's Bank; but from a careful study of this record we think the conclusions about to be noted are justified. The $5,000 note (item 2 above), the $5,000 chattel mortgage above noted and a $5,000 real estate mortgage which was discharged of record the 14th day of August, 1924, all had their inception on the same date, November 20, 1923. It is a fair inference that these instruments all pertain to one transaction; but it must be borne in mind that the discharge of the real-estate mortgage was apparently a part of the transaction whereby the $10,000 mortgage of the Grange Life Insurance Company was made a first lien and that simultaneously therewith Stephen H. Clink, Sr., took a new mortgage in the sum of $12,000. Hereinafter we will consider plaintiff's contention that there was no consideration for the $5,000 note just above mentioned.

Except as heretofore noted, the record is quite barren of any persuasive testimony, except for the instruments themselves, as to the character of the other note items above listed. These other items (exclusive of the $5,000 note) total approximately $18,500. After these notes came into the possession of the Hackley Union National Bank discussions occurred between the bank as administrator and plaintiff as to what was the true amount of his indebtedness to the Clink estate. While from time to

time plaintiff was billed by the bank for items of interest, it is his contention that he never was advised by the bank as to the exact items on which he was paying; and in response to his request for a statement of the items he was furnished a memorandum which merely disclosed a total claimed indebtedness of $12,500. Just how this amount was fixed upon appears only from the fact that as the result of conferences between the bank and plaintiff as to how much he actually owed the Clink estate there seems to have been a final adjustment on the basis of $12,500. There is testimony that incident to such discussions plaintiff contended there was no consideration for the $5,000 note hereinbefore mentioned; but even if that item were deducted from the total of the unpaid principal of the notes above listed there was still a balance, as noted, of approximately $18,500. On this phase of the case the trust officer of the Hackley Union National Bank, Reiner Linglebach, testified:

"I will say that on and after April 1, 1932, we had agreed, had an agreement with Mr. Langkawel that if the $12,500 was duly paid us, either in cash or by virtue of the collection of life insurance, that all notes or instruments we had would be discharged. I am speaking of the chattel mortgage, real estate mortgage, and notes would be surrendered. * * * It was the figure arrived at mutually from the evidence you see here."

The trial judge found: "He (plaintiff) seems to have agreed with the Hackley bank, not only that he was so indebted, but upon a definite amount, on which he paid interest for a number of years." This finding is sustained by the record.

For the years 1930, 1931, and 1932, interest due from plaintiff to the Clink estate was computed by

the bank on the basis of a $12,500 indebtedness and paid by plaintiff. Actual indorsement of interest payments made after the Hackley bank became administrator was not made on any of the notes or mortgages hereinbefore listed. But in our view of the record some portion of these interest payments was necessarily applicable to the indebtedness represented by the $12,000 mortgage or the $3,000 and $9,000 notes, which were in the administrator's possession. Under such a record, subject to other contentions of plaintiff hereinafter considered we conclude plaintiff's contention that the mortgage obligation was barred by the statute of limitations is not in accord with the proofs; and that under Act No. 155, § 5, Pub. Acts 1937, as amended by Act No. 244, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 3723–5, Stat. Ann. 1940 Cum. Supp. § 7.955), defendants Clink as holders of the mortgagee interest had priority of right to match the bid accepted at the scavenger sale.

The following phase of the record also has a material bearing on plaintiff's contention that the $12,000 mortgage, dated August 5, 1924, had outlawed prior to the scavenger sale in 1941, and therefore it could not be asserted by defendants Clink as an interest held by them in the property in suit. Throughout the years of these transactions plaintiff made many payments of interest by delivering coal to the Clink estate. On March 18, 1938, the Hackley Union National Bank assigned the $12,000 mortgage to Stephen H. Clink, defendant herein, as a trustee, evidently for the benefit of himself and his sister, each of whom were entitled to one-half of the residue of the estate of Stephen H. Clink, Sr. By this time plaintiff was in badly straitened circumstances financially. Taxes on the property herein involved were unpaid, and no payments on

plaintiff's indebtedness to the Clink estate had been made since early in 1932. The record shows, without giving much of the details, that there were various conversations between defendant Stephen H. Clink and plaintiff concerning the latter's indebtedness to the Clinks. Several items of fuel had been sold and delivered by plaintiff to the Clink estate. This fuel account was adjusted on March 28, 1938, by plaintiff receipting the fuel bill for $48.40, and noting thereon "Received Payment OTTO LANGKAWEL 3/28/38." The undisputed record is that no money passed in payment of this bill. Instead it clearly was considered by all parties concerned as a payment on plaintiff's indebtedness to the Clinks. Incident to this transaction plaintiff received from defendant Stephen H. Clink a receipt which reads:

"Muskegon, Michigan
Mar. 28, 1938.
"Received from ........ OTTO LANGKAWEL
............ Forty-eight and 40/100...... Dollars.
$48.40 Interest on notes to Stephen H. Clink.
"(Signed) Stephen H. Clink.
By Stephen H. Clink
Trustee."

The above receipt was put in evidence by plaintiff and in connection with it the following appears in plaintiff's cross-examination of defendant Stephen H. Clink:

"*Q.* Now, for whom were you trustee at that time, witness?
"*A.* For myself and sister.
"*Q.* Was that before or after the termination of the trust at the Hackley Union National Bank?
"*A.* Afterward.
"*Q.* That was afterward. Now, can you show us the notes upon which you indicate by (on) which

the payment was made or applied by you? Upon
what notes was this payment applied evidenced by
this receipt?

"*A.* As far as the actual application being made,
evidenced by writing, no. application of that kind
was ever made by me or Mr. Langkawel. * * *

"I didn't indorse this payment on any note; the
only thing I can tell you is my own personal appli-
cation, made mentally and sustained by the reason
for it. I applied it mentally upon the notes that
form the basis for this mortgage; they are in evi-
dence. * * * The only thought that I had in
making that receipt was that it was to be applied
upon notes which were the basis for that mortgage.
The notes are all here; how this thing works out, I
don't know."

Under such circumstances the item of $48.40
should be held to have been a payment on the mort-
gage debt, notwithstanding it was not actually in-
dorsed either on the mortgage notes or the mort-
gage. The transaction just noted was sufficient to
save the mortgage from becoming outlawed; and
plaintiff's claim to the contrary cannot be sustained.

In part plaintiff attacks the foregoing conclusion
by asserting that the $5,000 note hereinbefore listed
was a so-called "good will" note and was given
without consideration, and that all items of interest
paid on this note should be credited on plaintiff's
valid obligations to the Clinks. If this were to be
done it is obvious it would reduce the amount of the
interest of the Clinks in the land sold at the scaven-
ger sale and might affect their claim of prior right
to match the highest bid. However, we cannot ac-
cede to plaintiff's claim of lack of consideration for
the $5,000 note, because that contention is not sus-
tained by competent proof. Conversations which
plaintiff and his wife had with the trust officer of
the bank, acting as administrator, could not nullify

the note which was put in evidence by plaintiff, and which was valid on its face and in the lifetime of Stephen H. Clink, Sr., was indorsed with payment of interest by delivery of coal in the amount of $318.70, and by check for $14.33. Surely, it is somewhat significant as bearing upon the validity of this $5,000 note, dated November 20, 1923, that plaintiff made the interest payments just before noted on January 19, 1925, only a little over a year after the note was given; and according to his own testimony paid numerous annual instalments of interest thereafter on this same note. Plaintiff's claim made after the death of Stephen H. Clink, Sr., and after plaintiff had paid interest thereon during the life of Mr. Clink and subsequent thereto, comes rather belatedly, especially in view of the fact that the record is barren of any persuasive testimony as to how or why plaintiff actually came to give Mr. Clink this particular written obligation without any consideration therefor. We do not find this note was without consideration. The record is to the contrary.

In arriving at the conclusions hereinbefore noted, we are mindful that Mr. Linglebach, the trust officer for the administrator bank, in the course of his cross-examination testified that the $12,500 which had been agreed upon between the bank as administrator and plaintiff as the amount of the latter's indebtedness to the Clink estate consisted of the amount the administrator had paid to the National Lumberman's Bank ($7,543.84) in satisfaction of plaintiff's indebtedness to that bank, and the $5,000 note just above discussed; but we are satisfied that this was an inadvertent and inaccurate statement. The witness immediately testified that the amount of the indebtedness agreed upon was made up of more than these two items. We are convinced from the record that in agreeing upon a compromise amount of the indebtedness as $12,500, each of the

respective items in the possession of the adminis-
trator which evidenced plaintiff's indebtedness to
the Clinks was taken into consideration.

We conclude that at the date of the scavenger
sale (February 17, 1941), the $12,000 mortgage, with
accrued and unpaid interest amounting to more than
$5,000, had not outlawed, as plaintiff claims; and
even though credit was given on the mortgage debt
for the item of $1,450, the cash surrender value of a
paid-up life insurance policy, which passed from
plaintiff to the Clinks, the defendants Clink still had
a decidedly larger financial interest than plaintiff
in his property sold at the scavenger sale. The as-
sessed valuation of this property was approximately
$10,000. Each of two expert witnesses who testified
for plaintiff fixed its value at $14,000. Since the
scavenger sale it has been sold on contracts for a
much smaller amount. It follows the State land of-
fice board correctly determined that the defendants
Clink, as against plaintiff, had the superior right to
match the bid for which the property had been sold.

In view of the foregoing conclusion, numerous
other questions raised on this appeal may be passed
without comment because decision would not be af-
fected thereby. We note only two of them. (1) Ap-
pellant's contention that the trial judge's findings of
fact, there being no cross-appeal by defendants, are
*res judicata* on this appeal, is not sound, since we
hear the case *de novo;* and (2) appellant's assertion,
made for the first time in his reply brief recently
filed, that since defendant Stephen H. Clink had only
a one-half interest in the $12,000 mortgage, that
should be the basis of fixing his financial interest in
the mortgaged property and in determining his
right to match the bid, is also untenable. Conclu-
sively, this record discloses that throughout the tax
sale proceedings defendant Stephen H. Clink was
acting for both himself and his sister, defendant

Janet Clink Lawrence. Together they possessed the whole of the financial interest in this property arising from the $12,000 mortgage and accrued interest. Their right to match the bid must be determined in the light of that fact, as was done by the State land office board.

In amplification of decision herein the following may be added. While, with the exception of plaintiff's denial that he ever received any money direct from the Clinks, there is no direct evidence to sustain such a theory in this case, if by inference from the record as a whole and construed most favorably to plaintiff we were to conclude that the $12,000 mortgage was given by plaintiff to Stephen H. Clink, Sr., solely as security to indemnify him against loss resulting from his paying as indorser any portion of plaintiff's indebtedness to the National Lumberman's Bank, this result would follow. Plaintiff admits the Clink estate paid on such liability $7,543.84, together with approximately $40 accrued interest, and that from 1932 to the time of the scavenger sale in 1941 nothing was paid on accrued interest or principal of this indebtedness to the Clink estate or to the defendants Clink except $48.40 on March 28, 1938, and possibly the above-mentioned insurance item of $1,450. Even on such a factual basis, the financial interest of defendants Clink in plaintiff's property sold at the scavenger sale was greater than that of plaintiff and, therefore, the defendants Clink had a prior right to match the bid made at such sale.

The decree entered in the circuit court is affirmed, with costs.

Boyles, C. J., and Chandler, Starr, Wiest, Butzel, Bushnell, and Sharpe, JJ., concurred.